# THE CENTRE FOR COUNSELING AND EDUCATION, INC. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

Case No. 83-1962

State of Florida, Division of Administrative Hearings

July 13, 1984

**APPEARANCES OF COUNSEL**

**Norman S. Segall** for petitioner.

**Leonard Helfand** for respondent.

## OPINION

LINDA M. RIGOT, Hearing Officer.

## RECOMMENDED ORDER

Pursuant to notice, this cause was heard by Linda M. Rigot, the assigned Hearing Officer of the Division of Administrative Hearings on November 3 and 4, 1983, and on December 20, 1983, in Miami, Florida. The parties' posthearing submissions were completed on May 10, 1984.

Petitioner The Centre for Counseling and Education, Inc., was represented by Norman S. Segall, Esquire, Coral Gables, Florida; and Respondent Department of Health and Rehabilitative Services was represented by Leonard Helfand, Esquire, Miami, Florida.

By letter dated June 8, 1983, Respondent advised Petitioner that it was seeking reimbursement for certain budget disallowances for two fiscal years in which Respondent had awarded grants for drug treatment services. Petitioner timely requested a formal hearing on Respondent's attempt to hold it responsible for reimbursement for the 1981-82 fiscal year, on the appropriateness of Respondent's budget disallowances for the 1982-83 fiscal year, on Respondent's withholding from Petitioner a price level increase during the 1982-83 fiscal year, and on Respondent's refusal to renew the 1982-83 contract for the 1983-84 fiscal year.

Petitioner presented the testimony of Sharon Ally; Barbara Price; Nelson Rodney; Shirley Taxay; Ruth Einhorn; Miriam Franchi-Alfaro; and, by way of deposition, Ellen Coulton. Additionally, Petitioner's Exhibits number 1-15 were admitted in evidence.

Respondent presented the testimony of Stanley W. Swindling, Jr.; Clara Braswell; Dorothy Sasmor; Wansley Walters; Doris Atlas; Ruth Einhorn; and, by way of deposition, Ora Green. Additionally, Respondent's Exhibits numbered 1-20 were admitted in evidence.

Both parties submitted posthearing proposed findings of fact in the form of a proposed recommended order. To the extent that any proposed findings have not been adopted in this Recommended Order, they have been rejected as not having been supported by the evidence, as having been irrelevant to the issues under consideration herein, or as constituting unsupported argument of counsel or conclusions of law.

### FINDINGS OF FACT

1. The Centre, Inc., is a corporation operating counseling centers in Virginia and in Orlando, Florida. For a number of years, it also operated such a center in Miami, Florida, known as The Centre and also known as The Centre for Counseling and Education. Among the programs which it operated at its Miami facility was a program known

as "410", a federally funded program administered by Dade County, Florida, for the treatment and rehabilitation of drug abusers. In November 1981, pursuant to federal requirements, the Florida Department of Health and Rehabilitative Services took over administration of all 410 grants from Dade County. At that time, the Department executed new contracts with the providers with whom Dade County had contracted for the 1981-82 fiscal year commencing on July 1, 1981, and expiring June 30, 1982. At the time that Respondent entered into its contract with The Centre, Inc. (hereinafter "TCI"), Sharon Ally was the administrative director of The Centre, and Nelson Rodney was its executive director.

2. In May 1982, TCI decided to discontinue providing services in Miami in order to concentrate its efforts and resources in its counseling centers in Orlando and Virginia. At the same time, TCI did not want to abandon its clients in Miami and accordingly devised a plan under which its clients, including those being served with 410 grant money, would have continuity of care. Sharon Ally and Nelson Rodney negotiated an agreement whereby Nelson Rodney would incorporate a new, not-for-profit Florida corporation, which would then enter into a purchase and sale agreement with TCI whereby TCI would sell to that new corporation its assets, including the good will and trade names which TCI had established in the community. Sharon Ally contacted the Respondent's employees who serviced the 410 contract with TCI and told them of the plan by which the services offered at The Centre would continue to be offered without interruption and whereby the new corporation would even continue to employ the same staff and utilize the same names by which the facility was known in the community. Hearing no objection from Respondent's employees to that plan whereby clients at The Centre would continue to receive the same services from the same therapists in the same facility under the same business name, Nelson Rodney caused to be incorporated on June 16, 1982, a new Florida not-for-profit corporation known as The Centre for Counseling and Education, Inc. (hereinafter "CCE").

3. On June 21, 1982, both Sharon Ally and Nelson Rodney went to the Department to execute the contract for the 410 grant monies for the 1982-83 fiscal year. The contract which had originally been prepared so that the provider was shown to be TCI was corrected in three places to show that the provider was now CCE. Nelson Rodney, the president of CCE and the executive director of The Centre, executed the contract on behalf of the provider. The contract required that the provider submit an application and budget within 15 days of the execution of the contract.

184

4. On June 22, 1982, the purchase and sale agreement was consumated by the execution of a Closing Statement, Security Agreement, inventory, Form UCC-1, and a promissory note. All of those documents carried an effective date of July 1, 1982, the first day of the new fiscal year, and all of the documents were signed on behalf of CCE by its new president, Nelson Rodney, and on behalf of TCI by its administrative director, Sharon Ally. The inventory, made a part of the purchase and sale documents, specifically reflected those items of personal property which had been purchased wholly or partially with government funds and were therefore being transferred, as opposed to those items of personal property owned by TCI which were being sold to CCE. Also on June 22, 1982, CCE's president, Nelson Rodney, entered into an employment agreement on behalf of CCE with Sharon Ally, whereby she agreed to provide consulting services during the 1982-83 fiscal year at the cost of $35 per hour with the maximum of $5,000 payable under the employment agreement.

5. On July 15, 1982, CCE submitted its application and budget for the 1982-83 fiscal year. The program narrative on the first page of that submittal recites, once again, that CCE is a new corporation although it is operating with the same staff, personnel, facilities and location as TCI utilized when it was receiving 410 funding since 1970. The narrative further indicated that, although there was a new board of directors, there were no major changes in personnel policies at The Centre. The budget submitted by CCE was in the contract amount of $337,840, of which the state's share was $253,380, since the contract calls for a 75-percent reimbursement ratio. Thereafter, CCE heard nothing concerning any problem with its application or budget until September 1982, and in fact the Department employee responsible for monitoring the contract as to its programmatic component admitted to not even reading the budget or program narrative until September 1982.

6. On September 24, 1982, Nelson Rodney received a copy of Respondent's initial Budget Review of the budget submitted for the 1982-83 fiscal year on July 15, 1982. That Budget Review reads, in part, as follows:

This review addresses only major issues of allowability, reasonableness, and allocability. It does not cover matters of format, mathematical accuracy, or completeness of information or detail.

The problems with the budgets in these areas are so widespread that the Office of Grants decided to cover them in a forthcoming training session with all drug treatment providers.

**185**

Therefore, the submitted budget cannot be approved by September 30, as stated in said contract.

Following are major issues raised by the initial review:

\* \* \*

At this time you will be required to provide a response only to those issues where an explanation is required. The actual corrected budget will not be due until 30 days after the training session. You will be notified of details in the near future.

Both Nelson Rodney and the fiscal officer at CCE, Barbara Price, attended the October 13, 1982, training session conducted by Respondent's employees, which was one of at least several training sessions conducted throughout the 1982-83 fiscal year necessitated by the many problems that all providers were having with the new budget forms which had been initiated by the Department for the 1982-83 fiscal year. Rodney submitted CCE's response to the first Budget Review on October 27, 1982. Respondent did not reply to Rodney's response until January 1983.

7. Nelson Rodney again wrote to Respondent on November 29, 1982, asking Respondent to please send a budget approval since it would soon be the last six months of the contract year. Respondent responded to that letter on December 13, 1982, assuring Rodney that the Department understood the difficulties of not having an approved budget but that the Department was still working on The Centre's 1981-82 budget year, which may have some impact on the 1982-83 fiscal year. That was the first time that CCE was advised that Respondent considered TCI's 1981-82 budget to have some bearing on CCE's 1982-83 budget.

8. On January 24, 1983, the Department directed a letter to CCE advising that price level increases were being distributed to providers under 1982-83 410 contracts but that the Department was withholding from CCE its portion of those monies, since there were unresolved issues between CCE and the Department. The amount of price level increase due to CCE during the 1982-83 fiscal year was $15,662.

9. Correspondence, including more Budget Reviews, continued between the parties. A number of budget disallowances were made by the Department, and numerous requests were made to Nelson Rodney for additional documentation, to each of which requests Rodney and/or CCE's fiscal officer, Barbara Price, responded. Additionally, CCE submitted to the Department in February a revised budget as of January 1983, which made a number of revisions correcting figures

186

projected six months earlier or adjusting figures as a result of the numerous budget disallowances. On March 30, 1983, the Department transmitted to Rodney "Budget Review #3—Revised Budget."

10. On April 4, 1983, Respondent sent to Nelson Rodney a letter advising him that his organization owed the Department a refund of $44,082.01 as a result of budget disallowances for the 1981-82 fiscal year. On April 8, 1983, the Department received from TCI a response written by Sharon Ally, the administrative director of TCI, advising that TCI had received the April 4 demand letter, and advising that she had referred the matter to TCI's board of directors and had asked that a special meeting be called to review the matter, which meeting had been tentatively scheduled for April 27, 1983. The letter also responded to some of the specific items asserted by the Department and again advised the Department that CCE is, and always has been, a totally separate organization from TCI, that the two are not legally or functionally connected in any way, and that the two have never used the same bank accounts or accounting ledgers. Ally advised the Department that correspondence with TCI should be addressed to TCI's office in Orlando, Florida. On May 11, 1983, through the president of its board of directors, TCI wrote to the Department, reminding the Department that Nelson Rodney had forwarded the April 4 letter to TCI, that TCI had held a meeting of the board of directors on April 27 for the purpose of resolving the issues raised in that letter, assuring the Department of TCI's intention to remain fully cooperative with the Department, advising that TCI believed it necessary to seek legal counsel and the services of a professional accountant to research and validate the records in order to obtain the information necessary to take appropriate action, requesting the additional time necessary to complete the research, and providing to the Department a specific address to be used for further correspondence regarding TCI.

11. On May 11, 1983, the Department transmitted its fourth Budget Review for the 1982-83 fiscal year, which was the final determination regarding CCE's budget for the contract year scheduled to end June 30, 1983. That document recited a number of budget disallowances, which substantially reduced the budget of CCE so that not only would the Department not be forwarding the reimbursement payments due CCE for May and for June 1983, but CCE was also advised that it owed the Department a refund of $39,372.

12. On May 24, 1983, Nelson Rodney met with the Department employees involved in CCE's contract for 410 funding with boxes full of materials in an attempt to obtain some cooperation from the Department in resolving the pending issues. None of those documents

187

were reviewed by any of the Department employees attending that meeting, since the Department took the position that it was simply too late in the fiscal year to deal with some of the issues.

13. On June 8, 1983, Nelson Rodney was handed a letter advising him that CCE was still being held responsible for the refund under the 1981-82 contract with TCI, that CCE now also owed money to the Department under the 1982-83 contract, and that the final approved budget for CCE during the 1982-83 fiscal year was $237,505, of which the state's share would be $178,129, rather than the contract amount of $337,840, of which the state's share would be $253,380. Rodney was also verbally told at the time he was handed the letter regarding the 1981-82 and 1982-83 fiscal years that the Department would not contract with CCE for the 1983-84 fiscal year.

14. On June 27, 1983, the Department advised Nelson Rodney, this time in writing, that the Department would not contract with CCE for the 1983-84 fiscal year based on "continuing fiscal irregularities" in the 1981-82 and 1982-83 budgets, that he was expected to continue the services being provided to the 164 clients in the 410 program at CCE through the close of the fiscal year on June 30, 1983, and that effective July 1 (four days after notification) he was expected to have placed all 164 clients with other providers.

15. On July 28, 1983, CCE's attorney advised the Department that CCE was exercising its option to continue its contract with the Department pursuant to paragraph numbered 9 on page 15 of that contract, which reads as follows:

> This contract may be renewed for 12 months at 50%. The renewal is contingent upon adequate performance evaluations done by programmatic and financial staff, and subject to the availability of funds.

The Department employees involved with CCE's operation of the 410 program during the 1982-83 fiscal year have no criticism at all regarding the quality or the quantity of services provided by CCE to clients in the 410 program.

16. Although the Department still contends that TCI and CCE are one and the same entity, there is no relationship between the two corporations other than the fact that they have both, in sequence, provided counseling services to the clients of The Centre, also known as The Centre for Counseling and Education. TCI's representative informed the Department of the anticipated formation and existence of the new corporation prior to the execution of the contract for fiscal year 1982-83; TCI's representative and CCE's representative again so advised when the 1982-83 was executed and the name of the provider

188

was changed by the Department from TCI to CCE; CCE again advised the Department when the proposed budget was submitted on July 15, 1982; Nelson Rodney again advised the Department employee responsible for the fiscal component of the 1982-83 contract on September 4, 1982, and in response to her request forwarded to the Department not only copies of the articles of incorporation for CCE but also copies of the documents executed as part of the purchase and sale between TCI and CCE; and TCI and CCE both advised the Department in April of 1983 that the two corporations were not related. CCE and TCI have always maintained separate books and bank accounts; their stockholders, officers, and directors are different, with the exception only of Nelson Rodney, who was employed as the executive director of TCI and later became the president of CCE; the purchase of assets, including the right to use the names The Centre and The Centre for Counseling and Education, by CCE was an arm's-length transaction, after negotiation and for valuable consideration; and no reason existed for either CCE or TCI to mislead or deceive the Department regarding the purchase and sale and the formation by an employee of TCI of his own corporation wholly unrelated to TCI in any way, since the Department did not inform either party of its claim of a refund in the amount of $44,082.01 until April 4, 1983. Although TCI sold its Dade County assets to CCE, it remains an ongoing organization elsewhere in Florida and in Virginia. The Department has never contacted TCI regarding the refund it seeks under the 1981-82 contract since it received on May 17, 1983, the letter from TCI assuring the Department of TCI's cooperation with the demand and requesting more time in which to do the legal and fiscal research necessary to respond to the Department's demand. Likewise, TCI has not contacted the Department since that time, because on June 8 the Department advised CCE that CCE was responsible for the refund and CCE initiated this formal proceeding to contest that determination. There is no basis in law or in fact for holding CCE responsible for any disputes between the Department and TCI pursuant to the 1981-82 contract.

17. The Department's misunderstanding regarding the new corporation affected its consideration of the budget for the 1982-83 fiscal year and the attitude of its personnel in dealing with CCE. Specifically, consideration of the 1982-83 budget was delayed until almost the end of the budget year while the Department continued to make findings based on its monitoring of TCI's 1981-82 budget and while the Department refused to finalize its determination on CCE's 1982-83 budget until the 1981-82 issues were finalized. This delay, in turn, affected the consideration of various budget items which were disap-

189

proved, wholly or partially, due to the fact that the items were being considered late in the fiscal year. Such was the situation regarding CCE's request for various capital expenditures such as a telephone system, biofeedback equipment, filing cabinets, and lobby furniture and carpeting. Additionally, the Department substituted its business judgment for that of the provider regarding those capital expenditures.

18. CCE included in its budget the purchase of a telephone system for two reasons. First, the existing system was a basic six-button telephone system, with four outside lines, one intercom, and one hold button. CCE determined the system insufficient because of the frequency with which the lines were "tied up" so that clients could not telephone their therapists to make an appointment or solve a crisis. Second, the existing telephone had no privacy feature. As there were many telephone extensions at The Centre, anyone, including a client, could simply pick up an extension and listen to any conversation, including those which either should be confidential or are required by law to be confidential. CCE obtained several bids whereby it could purchase a telephone system almost identical to the one at the Department's local office. Initially, the Department disallowed this budget item because it was a "luxury," and later because May 1983 was too late in the fiscal year to consider it. Respondent improperly disallowed the purchase of the telephone system, since that purchase is both reasonable and necessary, since the cost is not excessive, and since the time of the budget year is not a proper concern, particularly when the delay has been caused by Respondent and payment under the contract is to have been made in such a manner as to have been complete by the end of the fiscal year.

19. Respondent improperly disallowed the purchase of biofeedback equipment. This purchase was recognized by the Department to be of benefit and is a reasonable therapy tool for treatment of drug abuse clients in the 410 program. This item was disallowed by the Department initially because Respondent's employees simply did not believe that the equipment would not be used for persons not in the 410 program, despite the provider's assertion that it would only use the equipment for 410 clients. It was disallowed later as being requested too late in the fiscal year. The purchase of biofeedback equipment is properly allocated 100 percent to the 410 program, as requested by CCE. The Department's remaining reason for rejecting this expenditure —that no other local treatment center has one—is insufficient to justify the disallowance where the evidence is that such units are in service elsewhere and paid for with funds under the 410 program.

20. Respondent erroneously disallowed the purchase of file cabinets

for the closed files of 410 clients, since the contract between CCE and the Department imposes strict requirements for the retention of closed files, and where access to such files is required by other agencies on a frequent basis due to the fact that data regarding each client in the 410 program is provided to a central computer data center, and agencies having access to that information frequently require providers of services to forward their files. Not only does the contract between the parties require that the client data be furnished and retained, it further requires that all documents pertinent to the contract be retained for a period of five years. The Department cannot simply refuse to believe that the filing cabinets would only be used for their 410 clients and base a budget disallowance on that assertion, as was done in this case. Additionally, the "minimum standard" of cardboard boxes is not the criterion to be utilized, does not solve CCE's problem of access for easy retrieval, and ignores the high recidivism of 410 clients.

21. Similarly, the Department erroneously disallowed the purchase of waiting room furniture and carpeting as requested by CCE. The Department's determination that CCE's lobby looked better than the lobbies of other Department providers is not an appropriate standard, particularly when the others are described as "dilapidated" by the same employees. CCE based its request on the fact that the carpeting and furniture were five years old, were located in a heavily trafficked area, had been professionally cleaned to no avail, and were in need of replacement.

22. When CCE and the Department entered into the 1982-83 contract, CCE was receiving federal funds for some of its services, which funds were administered by the Law Enforcement Assistance Administration. That source of funds ceased and, commencing October 1, 1982, the youth intervention program funded thereby became funded instead by Dade County, Florida, out of its general revenues. CCE continued to provide the services previously provided by it and started receiving its funding through the Dade County Criminal Justice Council rather than from the federal government. CCE determined that these funds could be used as "match" so as to be accountable as part of the 25 percent of the contract amount which was CCE's share pursuant to the contract between CCE and the Department. CCE advised the Department that the services performed for Dade County Criminal Justice Council clients "dove-tail" with those of the 410 program in that the services include individual, family, and group counseling as well as tutoring and remedial school work for delinquent and pre-delinquent youths. The goals of the program are to prevent criminal justice system contact for youths without previous contact and

**191**

to minimize further contact for those youths with previous juvenile justice experience. In its revised budget, CCE used the sum of $54,261 from its criminal justice funds as a substitute "match," since the Department had previously indicated it would disallow employee in-kind contributions. The sum claimed by CCE was computed by taking 9 months of the 12-month contract (only nine months of the contract with the county and the contract with the stat overlapped) times the percentage of youths which, in the experience of the provider and in research regarding delinquent and pre-delinquent youths, would have a substance abuse problem. That method of computation is reasonable and verified by data in client files. The Department disallowed these monies as match, since some of the files reviewed indicated the clients only used marijuana or alcohol "casually," a dispute as to the amount of substance consumed and not as to the nature of the youth using those substances. It is reasonable to assume that delinquent and pre-delinquent youths do not always disclose the full nature of their use of substances, either illegal per se or illegal for use by youths. The Department also disallowed the educational services provided to criminal justice youths as being improper services to match the 410 grant but later admitted that educational services had been previously determined to be allowable by their superiors in Tallahassee. Prior to the institution of these proceedings, the use of criminal justice funds as match had been disallowed on the basis of the source of funding; that is, the Department asserted the funds were federal funds and therefore could not be used as match. In spite of being advised by CCE and by Dade County that the funds were not federal funds, it was not until approximately October of 1983, just prior to the formal hearing in this cause, that the Department decided to believe that the funds were Dade County general revenue and therefore eligible as match. At the formal hearing in this cause, Respondent changed its position from disputing the use of these funds as match because of their source and decided to dispute the use of these funds because of their purpose. Their purpose qualifies them to be used as match.

23. Another item of dispute between the parties throughout the 1982-83 fiscal year was CCE's use of revenues as a basis of allocation of indirect costs. During the formal hearing, the parties stipulated as to the use of 61 percent as the basis of allocation.

24. The Department's disallowance of the value of time donated by employees and spouses of employees as "match" is also erroneous. CCE's personnel manual provides that its employees must work a minimum of 37.5 hours per week to be considered full-time employees and may be expected to work up to 40 hours per week for the same

192

rate of pay. The personnel manual further provides that if an employee works over 40 hours per week that employee is entitled to compensatory time. During the first three months of fiscal year 1982-83, CCE allowed its employees who wished to work over 40 hours per week and who did not wish to receive compensatory time for the time in excess of 40 hours to fill out time slips which were then used to compute employee in-kind donations of time to be used as match. The Department disallowed using employee-donated time for the reason that it erroneously believed that an employee is the same entity as the corporation signing the contract and cannot therefore be a third party to the contract and for the other stated reason that an employer is entitled to 100 percent of an employee's time and accordingly an employee can give no more. The in-kind policy in effect with Dade County at the time that the Department took over the administration of 410 funds from Dade County provided as follows:

### IV. *Donated Time*

A. Staff positions which have regular hours, assigned duties and in every aspect would normally be a paid position may be reported at the rate of a comparable paid position documented by a time sheet.

Respondent's similarly related disallowance of in-kind donated services by spouses of employees, who were attorneys, counselors, and teachers, is not explained. Claiming services performed by persons who are not paid for those services is reasonable and a proper item for "match" requirements. When the Department disallowed employee in-kind and in-kind from spouses of employees, CCE ceased keeping time records. CCE obtained volunteer professional services in the amount of $15,375.

25. The Department disallowed public service information costs as in-kind usable as match in the amount of $7,977. This amount, which CCE also attempted to use as "match" money, was disallowed without explanation, which disallowance was erroneous since the amount claimed was based upon documents received from the radio stations, television stations, and newspapers that advertised the availability of 410 services at The Centre as to what those advertisements would have cost Petitioner had Petitioner been charged for them.

26. Respondent disallowed from Petitioner's budget the $5,000 consultant fee for services performed by Sharon Ally pursuant to the employment agreement entered into between her and CCE on June 22, 1982. The reason for the Department's disallowance of this cost was its insistence that Sharon Ally was an employee of CCE, an assertion with absolutely no basis in fact. Accordingly, the disallowance of her fee

**193**

was erroneous. The testimony is uncontroverted that the majority of the consulting services rendered by her as to the hours which she billed to CCE were services related directly to the 410 grant and that she did not bill for numerous hours simply because they were in excess of the $5,000 cap CCE had placed in that employment agreement.

27. CCE claimed as a budget item the amount of $3,300 as a cost of having an audit performed by a CPA at the conclusion of the 1982-83 fiscal year. Respondent disallowed this item improperly, since its sole reason for doing so was its belief that Petitioner must have other grants requiring such an independent audit and therefore Respondent should not have to bear the expense. The 1982-83 contract between Respondent and Petitioner requires Petitioner to have an audit performed by an independent CPA and, therefore, is an expense directly related to the 410 program since it is required by the 410 program administrator. The testimony is uncontroverted that no other grants awarded by any entity other than Respondent require an outside audit. Although CCE also had a small contract with Respondent pursuant to a program not at issue herein which therefore also required an outside audit, it is reasonable for Petitioner to charge the 410 contrct with the price of the audit required by the 410 contract, rather than utilizing the small amount of money available for services under a different program when each program obligated itself to pay 100 percent of the cost of its required independent audit. Additionally, the other program constituted 5 percent of the 410 program cost and could have been charged 100 percent of the audit cost, instead of being charged nothing.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction over the subject matter hereof and the parties hereto. Section 120.57(1), *Florida Statutes* (1983).

2. Although the parties have submitted posthearing memoranda of law on the issue of the liability of CCE for any possible debts or obligations of TCI, the law is clear that in the absence of fraud or an agreement to assume the debts of another a corporation is simply not liable for the debts of another corporation whose assets it purchased for valuable consideration. Not only as there no evidence of fraud in the instant case, the evidence is to the contrary. Both Sharon Ally and Nelson Rodney told various Department employees involved in the monitoring of 410 contracts that TCI and CCE were not the same corporation and were not related. Additionally, Rodney supplied to Respondent copies of the documentation. There is simply no basis for the Department's assertion that the corporations are related because

194

TCI also included in the sale the right to use the name The Centre and the right to use the name The Centre for Counseling and Education. It is remarkable to think that had the name by which the facility was known in the community not been assumed, it is entirely probable that none of the disputes between the parties would ever have arisen. It is important to note that the amount of refund sought by the Department for the 1981-82 fiscal year has not been determined by the undersigned in this proceeding, nor is there a determination herein as to whether TCI owes money to Respondent as a result of the contract between them for the 1981-82 fiscal year. The extent of the ruling herein is that CCE is not TCI and is therefore not responsible for any of TCI's obligations or potential obligations, as it would also not be entitled to receive monies due to TCI.

3. The remainder of the issues must be determined in accordance with the contract between Petitioner and Respondent, 45 C.F.R. 74, O.M.B. Circular A-122 and Chapter 10E-7, *Florida Administrative Code*. Pursuant to those regulatory schemes, the Criminal Justice Council funds were allowable expenses and therefore properly qualified as match. A matching requirement may be satisfied by allowable costs incurred, including allowable costs borne by nonfederal grants. A cost is allowable if it is reasonable for the performance of the award and allocable thereto. See O.M.B. Circular A-122, Attached A, § A.2. A cost is allocable to a grant in accordance with the relative benefits received. See O.M.B. Circular A-122, Attachment A, § A.4. Under the terms of its contract, CCE was to provide treatment in accordance with the rules and regulations set forth in Chapter 10E-7, *Florida Administrative Code*. Section 10E-7.09, *Florida Administrative Code*, establishes the purpose of that chapter to be the prevention, education, and treatment of drug abusers or potential drug abusers. Additionally, Section 10E-7.10, *Florida Administrative Code*, defines the various programs covered by that chapter and specifically defines Drug Abuse Treatment and Education Centers to include facilities giving only outpatient treatment, such as CCE, as being facilities that serve the needs of persons who have been or have the potential for abusing or misusing drugs. Based upon Respondent's rules, the services provided the delinquent and pre-delinquent youths under the Dade County Criminal Justice Council grant are properly allowable and allocable and therefore are eligible to be used as match.

4. O.M.B. Circular A-122, Attachment A, § A.3 provides that "a cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs." In

disallowing some of the capital equipment expenditures, Respondent's employees testified the disallowance was based upon whether the proposed costs exceeded "minimum standards" or "whether the services would be hampered if the expenditure were not made." It is not surprising that that testimony was not supported by any citation to any regulation setting forth such standards. Rather, the contract between the parties provides for service to 164 patients based upon an established cost of $2,060 per patient per year. Therefore, provided that costs are allowable, the provider has latitude in the operation of its program. It was admitted that CCE had not had any adverse reports concerning its program or the treatment of its patients. There is no restriction contained in the regulations which requires a private provider to operate under restraints other than those imposed by prudence and sound business practices. See O.M.B. Circular A-122, Attachment A, § A.3. It may be that sound business practices for CCE exceed the "minimum standard" sought to be imposed by Respondent according to the testimony of its witnesses. If a provider exercises efficient business practices in other areas so as to have room in its budget for such items as an updated telephone system, biofeedback equipment, file cabinets, and comfortable lobby furniture, while still maintaining proper treatment for the patients, the Department cannot complain and disallow such items on the basis that it would prefer greater expenditures in other areas. Respondent has simply been unable to point to any specific section in the regulations, federal or state, or in the contract which permits it to disallow all capital expenditures simply because Respondent disagrees with the provider's decision or because Respondent does not determine the merits of the request until late in the fiscal year.

5. CCE was entitled to use in-kind employee contributions of time as match. See O.M.B. Circular A-122, Attachment B, § 10. The cited regulation specifically speaks of volunteer services and separates into a separate section services of employees of other organizations. It can only be concluded that the regulation contemplates donations of employee time eligible for use as match. This is the only reasonable interpretation, since an employee donating extra time for which no compensation is received is providing services which would otherwise have to be purchased. Additionally, Dade County, which previously administered the program for a number of years, had a regulation governing such employee in-kind donations of time. Respondent's disallowance of employee volunteer services as match is without foundation in any regulations. Moreover, Respondent's disallowance of donated services by spouses of employees—attorneys, counselors, and a

nuclear physicist—in addition to disallowing donated services by CCE's consulting psychiatrist, was totally arbitrary and without any basis in law or in fact.

6. CCE is entitled to the price level increase allocated for it, since all that remained was the ministerial act of completing the paperwork which was withheld by Respondent due to the disputes which are herein resolved against Respondent.

7. CCE exercised its option to renew the contract for 12 months at 50 percent. The contract states that it may be renewed contingent upon adequate performance evaluations done by programmatic and financial staff and subject to the availability of funds. No evidence was introduced showing any criticism of CCE's programmatic performance, and the disputes arising out of the fiscal component of the 410 grant were all disputes created by and resolved against Respondent. Further, no testimony has been introduced to show that funds are not available. Since the criteria for renewal have been met, CCE is entitled to a contract for 12 months for 50 percent of its 1982-83 level.

8. Based upon the stipulation dated December 20, 1983, Petitioner's 1982-83 budget should be adjusted as follows:

| | |
|---|---|
| Commencement amount | $240,921.00 |
| Sharon Ally consultant fees at 90 percent | 1,450.00 |
| Audit | 1,287.00 |
| File cabinets | 3,000.00 |
| Lobby furniture and carpet | 3,050.00 |
| Biofeedback equipment | 6,300.00 |
| Telephone system | 10,262.00 |
| Dade County Criminal Justice Fund[1] | 54,396.00 |
| Employee donated time | *7,200.00* |
| | $327,866.00 |
| | × 75% |
| State share | $245,899.50 |
| Price level increase | *15,662.00* |
| Total due Petitioner | $261,561.50 |
| Paid to date | *211,150.00* |
| Balance due Petitioner | $50,411.50 |

[1] Since Petitioner was entitled to use Dade County Justice funds as match, it is unnecessary to insert the amounts for volunteer professional service ($15,375) and donated public service information ($7,977) which Petitioner would be entitled to substitute.

## RECOMMENDATION

Based on the foregoing Findings of Fact and Conclusions of Law, it is

RECOMMENDED that a Final Order be entered finding:

(1) Petitioner not responsible for any disputes arising out of the contract for the 1981-82 fiscal year between Respondent and The Centre, Inc.

(2) Petitioner entitled to immediate payment of $50,411.50 by Respondent pursuant to the contract for the 1982-83 fiscal year.

(3) Petitioner entitled to immediate execution of a contract with Respondent for 12 months at 50 percent of the contract for the 1982-83 fiscal year, as that contract has been resolved herein.

DONE and RECOMMENDATED this 13th day of July, 1984, in Tallahassee, Leon County, Florida.

Editor's Note: The foregoing decision was appealed to the Third District Court of Appeal and subsequently upheld.